**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN HENNEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15 C 9452 |
| v. | ) | |
| | ) | |
| METROPOLITAN LIFE INSURANCE COMPANY | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Susan Hennen ("Hennen") received long-term disability benefits from Defendant Metropolitan Life Insurance Company ("MetLife") under the provisions of NCR Corporation's long-term disability benefits plan (the "Plan"). The Plan limited long-term disability benefits for Hennen's impairment to 24 months in the absence of objective evidence of a condition called radiculopathy. MetLife determined that Hennen failed to present such evidence at the end of the 24-month period and terminated Hennen's benefits. Hennen sued MetLife under the Employee Retirement Income Security Act ("ERISA") to challenge this decision.

Hennen and MetLife have filed cross-motions for summary judgment. R. 25; R. 29. Both parties seek fees and costs. *Id.* For the reasons explained below, MetLife's motion for summary judgment is granted, and Hennen's motion for summary judgment is denied. MetLife's request for fees and costs is denied.

**Background**[1]

**A.     NCR Corporation's Long-Term Disability Benefits Plan**

The material facts in this case are undisputed. While employed by NCR Corporation, Hennen received long-term disability ("LTD") coverage under the Plan, which is funded by a group insurance policy issued by MetLife. PSMF ¶¶ 17, 20; DSMF ¶¶ 8, 18.

Under the Plan, "'Disability' means that due to sickness, pregnancy, or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis." DSMF ¶ 3; PR ¶ 3. In a section titled "Limitation For Disabilities Due to Particular Conditions," the Plan explains that "Monthly Benefits are limited to 24 months during your lifetime if you are Disabled due to a . . . Neuromusculoskeletal and soft tissue disorder . . . unless the Disability has objective evidence of . . . radiculopathies." PSMF ¶¶ 8, 9; DSMF ¶ 4.

The Plan defines "[n]euromusculoskeletal and soft tissue disorder" as "any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles." PSMF ¶ 8; DSMF ¶ 4. The Plan defines "radiculopathies" as "[d]isease of the peripheral nerve roots supported by objective clinical findings of nerve pathology." PSMF ¶ 9; DSMF ¶ 4.

---

[1]     The Court cites MetLife's Statement of Material Facts (R. 30) as "DSMF ¶ __," Hennen's Response (R. 39) as "PR ¶ __," Hennen's Statement of Material Facts (R. 27) as "PSMF ¶ __," and MetLife's Response (R. 40) as "DR ¶ __."

## B.    Hennen's Medical History

Hennen has a long history of low-back problems. She had low-back surgeries in 2003 and 2008 while working as a sales specialist for NCR Corporation. PSMF ¶¶ 11, 13; DR ¶¶ 11, 13.

Following a third surgery in September 2012 for a herniated disk, MetLife approved Hennen's claim for LTD benefits. PSMF ¶ 20; DSMF ¶ 18. MetLife's letter to Hennen awarding benefits explained that she satisfied the Plan's definition of "[n]euromusculoskeletal and soft tissue disorder" and that "the maximum benefit duration due to th[is] limited condition will be reached on November 11, 2014 . . . . Benefits may continue after November 11, 2014 if you continue to satisfy the definition of Disability solely due to other non-limited medical condition(s) and other plan requirements . . . ." PSMF ¶ 20; DSMF ¶ 18.

Hennen's spine surgeon Dr. Frank Phillips noted in his operative report for the September 2012 surgery that Hennen's "nerves were free of compression and mobile." DSMF ¶ 16; PR ¶ 15. In a December 2012 office note, Dr. Phillips stated that Hennen had "good improvement in her back pain," and her continuing symptoms "probably represent[ed] some residual nerve pain." PSMF ¶ 22; DSMF ¶ 20. Dr. Phillips ordered an MRI to "rule out any recurrent or residual neural compression." DSMF ¶ 20; PR ¶ 20. The MRI showed "stable" post-surgical changes "without significant stenosis." DSMF ¶ 21; PR ¶ 21.

Hennen then began pain management treatment with anesthesiologist and pain management specialist Dr. Asokumar Buvanendran. PSMF ¶ 24; DSMF ¶¶ 16,

22. In February 2013, Dr. Buvanendran diagnosed Hennen with "[l]umbar radiculopathy." PSMF ¶ 28; DSMF ¶ 22.

Hennen had another low-back surgery in April 2013 to implant an epidural spinal cord stimulator. PSMF ¶ 29; DSMF ¶ 23. Hennen experienced a dramatic reduction in pain after that surgery. PSMF ¶ 29; DSMF ¶ 23.

In May 2014, Hennen had another surgery: a left hip arthroscopy with orthopedic surgeon Dr. Shane Nho to repair a muscle tear sustained during a fall. PSMF ¶ 35; DSMF ¶¶ 24, 26. An MRI of Hennen's hip prior to the surgery demonstrated the muscle tear, but also showed that "[t]he neurovascular bundles are grossly intact, with no extrinsic compression." DSMF ¶ 25; PR ¶ 25. After the surgery, Dr. Nho informed MetLife that he estimated Hennen could return to work by August 15, 2014. DSMF ¶ 26; PR ¶ 26.

Post-surgery, Hennen continued to report shooting nerve pain down her leg. PSMF ¶ 36; DR ¶ 36. In a questionnaire completed for MetLife in July 2014, Dr. Buvanendran again diagnosed Hennen with "lumbar radiculopathy." PSMF ¶ 37; DR ¶ 37.

In August 2014, Dr. Nho submitted an attending physician's statement to MetLife explaining that Hennen's hip was "structurally sound," noting that Hennen's pain was likely "back and neuropathic related," and referring her care to Dr. Buvanendran. PSMF ¶ 39; DSMF ¶ 28.

## C.    MetLife's Termination Of Hennen's Benefits

MetLife contacted Hennen by telephone on August 15, August 18, and September 18, 2014 to explain that an MRI or electromyogram ("EMG") was required to determine if her condition fell within the radiculopathies exception to the Plan's 24-month benefit limitation for neuromusculoskeletal and soft tissue disorders. DSMF ¶¶ 29, 30, 32; PR ¶¶ 29, 30, 32. MetLife sent a letter to Hennen on October 13 explaining that it planned to terminate her benefits on November 11. PSMF ¶ 41; DSMF ¶ 33. The letter informed Hennen of her right to an administrative appeal, explaining that any appeal should include objective findings including "Current test results (MRI, CT, EMG)." DSMF ¶ 33; PR ¶ 33.

On October 17, Dr. Buvanendran sent MetLife a letter reaffirming his diagnosis of lumbar radiculopathy. PSMF ¶ 42; DR ¶ 42. He included a copy of a recent, September 2014 MRI. PSMF ¶ 45; DSMF ¶ 35. MetLife consulted with its medical doctor, Dr. David Peters, who found that Hennen's September 2014 "MRI does not reveal ongoing nerve root or spinal cord compression that would support a current diagnosis of lumbar radiculopathy." PSMF ¶ 46; DSMF ¶¶ 31, 36. Hennen's LTD benefits terminated in November 2014.

Hennen appealed MetLife's determination in July 2015. She submitted an EMG from June 2015 in support of her appeal. PSMF ¶¶ 47-48; DSMF ¶¶ 38-40. The fellow-in-training, Dr. Joseph Kipta, who administered Hennen's EMG stated in the "Impression" section of his report that Hennen's "superficial peroneal sensory responses" constituted "evidence to support left lumbar motor polyradiculopathies."

PSMF ¶ 48; DSMF ¶¶ 38-40. But he commented that "[n]o abnormal spontaneous or insertional activity was noted in any of the muscles examined" during the EMG. DSMF ¶ 39; PR ¶ 39. He explained that "[f]urther clinical correlation is advised." DSMF ¶ 40; PR ¶ 40. In July 2015, MetLife consulted its medical doctor certified in family medicine, Dr. Dupe Adewunmi, who opined that the EMG supported a diagnosis of radiculopathy. DSMF ¶ 42; PR ¶ 42.

In a claims note later that month, MetLife's appeal specialist observed that the Plan specifies that, during an administrative appeal, "MetLife will consult with a health care professional with appropriate training and experience in the field of medicine involved in the medical judgment." DSMF ¶¶ 6, 43; PR ¶¶ 6, 43. Around this time, MetLife learned that the Social Security Administration had denied Hennen's claim for disability income benefits at the initial application stage. DSMF ¶ 41; PR ¶ 41.

MetLife then consulted Dr. Neil McPhee, who is board certified in physical medicine and rehabilitation. PSMF ¶ 53; DSMF ¶ 44. In August 2015, after reviewing Hennen's medical records, Dr. McPhee submitted a 27-page report finding that Hennen's December 2012 and September 2014 MRIs showed no radiculopathy, and that her June 2015 EMG likewise "was negative for active radiculopathy." PSMF ¶ 54; DSMF ¶¶ 44-45.

MetLife sent Dr. McPhee's analysis to Hennen's attorney and Dr. Buvanendran, who both responded with letters protesting and disputing Dr. McPhee's conclusions. PSMF ¶¶ 57-60; DSMF ¶¶ 50-52. In October 2015, Dr.

McPhee prepared an addendum to his report addressing these letters. DSMF ¶ 53; PR ¶ 53. The addendum confirmed his previous conclusion that the December 2012 and September 2014 MRIs did not show radiculopathy. DSMF ¶ 55; PR ¶ 55. Dr. McPhee further explained that the June 2015 EMG "recorded no abnormal spontaneous or insertional activity in any of the muscles examined as would be expected if there was active radiculopathy." DSMF ¶ 56; PR ¶ 56.

Dr. McPhee stated in his addendum that the "motor unit action potentials" data, which Dr. Kipta interpreted as evidence of polyradiculopathies, "would possibly be consistent with a past history of radiculopathy" but not with current or active radiculopathy. DSMF ¶ 56; PR ¶ 56. Dr. McPhee explained:

> Perhaps an analogy would be helpful. At the time of a bone fracture, there are associated symptoms including pain, as well as evidence of the fracture on x-ray. With time the bone fracture heals, but there is still evidence on the x-ray of a prior fracture with changes reflecting the healing. Similarly, the claimant had herniated discs in the past that presumably were compressing nerve roots causing radiculopathy . . . [T]he discs were removed surgically and there is no longer compression on the nerve and no longer examination or EMG findings consistent with active radiculopathy . . . but the motor unit potentials observed may be evidence that she had radiculopathy in the past.

DSMF ¶ 59; PR ¶ 59.

Dr. McPhee also noted at one point in his addendum "that the fellow in training performing the [EMG] should have performed needle examination in corresponding right lower extremity muscles, and it is still my opinion that additional electrodiagnostic testing would be helpful. Similarly, consideration should be given to an independent medical examination . . . if needed to further assess the issue of possible radiculopathy." R. 28-1 at 31.

On October 8, 2015, MetLife affirmed its decision terminating Hennen's LTD benefits. DSMF ¶ 61; PR ¶ 61. It explained:

> [W]e are upholding the termination of Ms. Hennen's LTD benefits based on our conclusion that she has reached the maximum benefit payable for her neuromusculoskeletal and soft tissue disorder limited benefit conditions, and the medical information provided does not demonstrate that she has objective clinical findings of nerve pathology to support the limited benefit exception diagnosis of radiculopathy as required by the Plan.

DSMF ¶ 61; PR ¶ 61.

On October 23, 2015, Hennen sued MetLife. R. 1. The parties' cross-motions for summary judgment are currently before the Court. R. 25; R. 29.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the parties have filed cross-motions for summary judgment, the Court applies this standard to each motion separately in order to determine whether there is a genuine dispute of material fact and whether judgment should be entered as a matter of law. *Marcatante v. City of Chicago,* 657 F.3d 433, 438-39 (7th Cir. 2011). In ruling on each cross-motion for summary judgment, the Court draws inferences in favor of the party against whom the motion under consideration is made. *Siliven v. Ind. Dep't of Child Servs.,* 635 F.3d 921, 925 (7th Cir. 2011).

## Analysis

The parties agree that the Plan is governed by ERISA. Congress enacted ERISA to "to enable employers to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits." *Melton v. Melton,* 324 F.3d 941, 944 (7th Cir. 2003) (quotation marks omitted). ERISA mandates that covered plans "be administered, and benefits be paid, in accordance with plan documents." *Egelhoff v. Egelhoff,* 532 U.S. 141, 150 (2001).

ERISA's "comprehensive legislative scheme" includes "an integrated system of procedures for enforcement." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004) (quotation marks omitted). Under 29 U.S.C. § 1132(a)(1)(B), "a civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Pursuant to § 501(a)(1)(B), Hennen challenges MetLife's decision to terminate her LTD benefits after 24 months. *E.g.*, R. 1 ¶ 4. Hennen argues that MetLife incorrectly determined that she did not qualify for continuing benefits under the radiculopathy exception.

## I. The Court Applies An Arbitrary And Capricious Standard Of Review To MetLife's Determination.

If an ERISA plan gives the plan administrator discretionary authority, this Court will "set aside [the] administrator's decision only if it is arbitrary and capricious." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 744-45 (7th Cir. 2009). The parties agree that the Plan in this case gives MetLife discretionary authority. PSMF ¶ 10; DR ¶ 10. And the state where the Plan was issued (Ohio) does not ban discretionary clauses of this nature. R. 26 at 6. Accordingly, this Court applies an arbitrary and capricious standard of review.

The arbitrary and capricious standard "embod[ies] the highest level of deference." *Exbom v. Cent. States, Se. & Sw. Areas Health & Welfare Fund,* 900 F.2d 1138, 1142 (7th Cir. 1990). This Court must uphold MetLife's benefit determination if: "(1) it is possible to offer a reasoned explanation, based on the evidence, for the outcome; (2) the decision is based on a reasonable explanation of relevant plan documents; or (3) the administrator has based the decision on a consideration of the relevant factors that encompass the important aspects of the problem." *Houston v. Provident Life & Accident Ins. Co.,* 390 F.3d 990, 995 (7th Cir. 2004) (quotation marks omitted). Although the Court will "not uphold a termination [of benefits] when there is an absence of reasoning in the record to support it,"

*Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (quotation marks omitted), if the administrator "makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts . . . then the [administrator's] decision is final," *Exbom*, 900 F.2d at 1143.

Hennen correctly maintains that when applying the arbitrary and capricious standard, this Court should consider MetLife's conflict of interest. The Supreme Court has recognized that a plan administrator like MetLife that "both evaluates claims for benefits and pays benefits claims" operates under a structural conflict. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). As Hennen acknowledges, however, a "'structural conflict of interest'" like MetLife's does not change the standard of review, but instead is "'a factor'" this Court considers that "'will act as a tiebreaker when the other factors are closely balanced.'" R. 26 at 7, 13 (quoting *Glenn*, 554 U.S. at 108).

## II. MetLife's Determination Was Not Arbitrary And Capricious.

### A. MetLife Reasonably Interpreted The Plan.

Ordinary principles of contract interpretation govern the interpretation of an ERISA plan. *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 102 (2013). Courts construe ERISA plans by "looking to the terms of the plan" as well as to "other manifestations of the parties' intent." *Id.* (quotation marks omitted). When doing so, courts are mindful of the "'background of common-sense understandings and legal principles that the parties may not have bothered to incorporate expressly but that operate as default rules to govern in the absence of a clear expression of the

parties' [contrary] intent.'" *Id.* (quoting *Wal–Mart Stores, Inc. Assoc. Health & Welfare Plan v. Wells,* 213 F.3d 398, 402 (7th Cir. 2000)).

Here, the Plan provides that "'Disability' means . . . you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis." DSMF ¶ 3; PR ¶ 3. The Plan explains that "Monthly Benefits are limited to 24 months during your lifetime if you are Disabled due to a . . . Neuromusculoskeletal and soft tissue disorder . . . unless the Disability has objective evidence of . . . radiculopathies." PSMF ¶¶ 8, 9; DSMF ¶¶ 3, 4. MetLife interpreted this language to mean that Hennen needed to supply "objective evidence" by way of "Current test results" showing radiculopathy at the end of the 24-month period to satisfy the radiculopathy exception. DSMF ¶ 33; PR ¶ 33; *see also* PSMF ¶ 20 & DSMF ¶ 18 (MetLife advised Hennen when it first awarded LTD benefits that payments would continue past 24 months only "if you *continue* to satisfy the definition of Disability solely due to other non-limited medical condition(s) and other plan requirements . . . .") (emphasis added).

Hennen claims that MetLife incorrectly interpreted the Plan to require proof of "active radiculopathy" at the end of 24 months. Hennen seizes on Dr. McPhee's use of the term "active" in finding that the EMG showed no "active radiculopathy." DSMF ¶ 56; PR ¶ 56. She points out that the term "active radiculopathy" appears nowhere in the Plan's definition of radiculopathy as "[d]isease of the peripheral nerve roots supported by objective clinical findings of nerve pathology." PSMF ¶ 9;

DSMF ¶ 4. But it is Hennen, not MetLife, who takes an "excessively narrow" (R. 38 at 3) view of the Plan language.

For starters, there is nothing special or unusual about Dr. McPhee's use of the term "active radiculopathy." Rather, that term is frequently used by courts and medical professionals to denote current, ongoing radiculopathy. *E.g.*, *Jones v. Astrue*, 623 F.3d 1155, 1158 (7th Cir. 2010) (surgeon said plaintiff had no "active radiculopathy"); *Angel v. Barnhart*, 329 F.3d 1208, 1211 (10th Cir. 2003) ("no definitive evidence of active lumbar radiculopathy"); *Bishop v. Metro. Life Ins. Co.*, 70 F. App'x 305, 308 (6th Cir. 2003) ("no active radiculopathy"); *Zaccone v. Standard Life. Ins. Co.*, 36 F. Supp. 3d 781, 789 (N.D. Ill. 2014) (noting absence of "ongoing active radiculopathy"); *Groves v. Colvin*, 2014 WL 4311133, at *6 (N.D. Ind. Sept. 2, 2014) (EMG showed no "active radiculopathy").

And MetLife reasonably construed the Plan to require proof of active, current, or ongoing radiculopathy at the end of the 24-month period to support continuing benefits. Indeed, several other courts have interpreted the same MetLife radiculopathy exception and rejected Hennen's very argument. The Sixth Circuit in *Iley v. Metropolitan Life Insurance Co.*, 261 F. App'x 860 (6th Cir. 2008), found that:

> Met Life was not unreasonable in requiring a diagnosis of radiculopathy, supported by objective clinical findings, at the end of the twenty-four month period. The Plan states that the beneficiary is required to show proof of a continuing disability at the behest of Met Life. The Plan also states that if that disability is radiculopathy, then the diagnosis must be supported by objective clinical findings. A plain reading of the Plan allows Met Life to request a diagnosis of radiculopathy supported by objective evidence at any time, including at the end of the twenty-four month period.

*Id.* at 864. The Eastern District of Missouri in *Iliff v. Metropolitan Life Insurance Co.*, 2012 WL 709234 (E.D. Mo. Mar. 5, 2012), similarly held that MetLife reasonably interpreted the provision "stat[ing] that benefits will terminate after twenty-four months, unless a beneficiary provides objective evidence of radiculopathies," to mean that beneficiaries are "required to show radiculopathy at the end of the twenty-four month period." *Id.* at *5; *see also McClenahan v. Metro. Life Ins. Co.*, 416 F. App'x 693, 697 (10th Cir. 2011) ("we can't say MetLife acted unreasonably when it denied benefits after she failed to provide evidence of radiculopathies on or after March 13, 2006"). The same reasoning applies here.

Hennen's contrary interpretation of the radiculopathy exception to encompass inactive, prior radiculopathy is inconsistent "with the purposes of both the disputed provisions and the overall plan." *Chi. Dist. Council of Carpenters Pension Fund v. Exhibition Contractors Co.*, 618 F. Supp. 234, 238 (N.D. Ill. 1985); *see also U.S. Airways*, 569 U.S. at 102 (courts apply "'a background of common-sense understandings'" in interpreting an ERISA plan) (quoting *Wal–Mart,* 213 F.3d at 402). As the *Illif* court explained, "[i]f beneficiaries were not required to show radiculopathy at the end of the twenty-four month period, then a claim for continued disability benefits could be based on a showing of radiculopathy that existed at some other time, even if the disorder did not contribute to the disability at the time the twenty-four month period expired. This outcome would be inconsistent with the purpose of the plan." 2012 WL 709234, at *5; *accord Iley*, 261 F. App'x at 864 (under plaintiff's interpretation, "Met Life would have no way to

stop payments of LTD benefits to any beneficiary once a diagnosis has been made, regardless of any contrary opinions in the record, or indication that the beneficiary no longer suffers from that condition").

Hennen claims that MetLife's interpretation will "deter[] claimants with active cord compression from pursuing surgery to alleviate that compression" "for fear of losing their LTD benefits." R. 26 at 9. This perverse course of conduct is far-fetched. Any rational claimant will pursue the course of treatment that addresses her injury. If a surgery is successful, all the better for the claimant, even if the claimant is no longer eligible for LTD benefits.

Plans should be able to differentiate between a patient with "alleviate[d]" symptoms and a patient with "active" symptoms. *See id.* MetLife reasonably interpreted the Plan language to reflect this distinction and to require current, objective evidence of radiculopathy at the end of the 24-month period to support continuing benefits.

## B.    MetLife's Application Of The Plan's Provisions To Hennen Has Rational Support In The Record.

An administrator's application of an ERISA plan's provisions should be overturned under the arbitrary and capricious standard only where there is an "absence of reasoning in the record to support" that application. *Holmstrom*, 615 F.3d at 766 (quotation marks omitted); *accord Becker v. Chrysler LLC Health Care Benefits Plan*, 691 F.3d 879, 885 (7th Cir. 2012) (under arbitrary and capricious standard, court "will only look to ensure that [the] decision has rational support in the record") (quotation marks omitted). MetLife terminated Hennen's benefits based

on its finding that she did not provide objective evidence of a diagnosis of radiculopathy at the end of the 24-month period "as required by the Plan." DSMF ¶ 61; PR ¶ 61.

In opposing this finding, Hennen focuses heavily on the distinction between inactive and active radiculopathy, claiming that MetLife improperly insisted on proof of active radiculopathy. *E.g.*, R. 26 at 7-11; R. 38 at 2-5. By making this argument, Hennen implicitly concedes she did not have the proof of *active* radiculopathy this Court already has determined MetLife reasonably interpreted the Plan to require.

In any event, regardless of what Hennen concedes, MetLife's determination that Hennen did not supply objective evidence of radiculopathy at the end of the 24-month period has rational support in the record. Hennen acknowledges that to be "objective," evidence of radiculopathy must be "corroborated by a current MRI, EMG, or other similar study." R. 26 at 11. The case law makes this plain. *See, e.g.*, *Angel*, 329 F.3d at 1211 (EMG and MRI showed "no definite evidence of active lumbar radiculopathy"); *Marden v. Metro. Life Ins. Co.*, 2012 WL 2020931, at *11-13 (D. N.D. June 5, 2012) (MetLife reasonably found no objective evidence of radiculopathy based on MRI and EMG); *Brien v. Metro. Life Ins. Co.*, 2012 WL 4370677, at *11-12 (D. Mass. Sept. 21, 2012) (same); *Meiringer v. Metro Life Ins. Co.*, 2009 WL 1788588, at *11 (D. Or. June 19, 2009) (same); *Zaccone*, 36 F. Supp. 3d at 797-800 (looking to EMG and MRI results as lack of "objective evidence" of radiculopathy); *see also Willcox v. Liberty Life Assur. Co.*, 552 F.3d 693, 701 (8th

Cir. 2009) (case cited by Hennen relying on "MRIs consistent with radiculopathy" along with other evidence as "objective evidence" of radiculopathy); *Warden v. Metro. Life Ins. Co.*, 574 F. Supp. 2d 838, 849 (M.D. Tenn. 2008) (case cited by Hennen noting that electrodiagnostic studies showed "ongoing" radiculopathy).

Here, Dr. McPhee and Dr. Peters both determined that Hennen's September 2014 MRI showed no radiculopathy. PSMF ¶¶ 46, 54; DSMF ¶¶ 31, 36, 44-47. And Dr. McPhee determined that the EMG showed no active radiculopathy. DSMF ¶ 56; PR ¶ 56.

It is true that Dr. McPhee's interpretation of the EMG contradicted the interpretations of other doctors, including Hennen's treating physicians Dr. Buvanendran and Dr. Kipta. But "[n]othing in [ERISA] . . . suggests that plan administrators must accord special deference to the opinions of treating physicians. Nor does the Act impose a heightened burden of explanation on administrators when they reject a treating physician's opinion." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831 (2003). Rather, in "a contest of competing medical opinions . . . under our deferential standard of review, [courts] must defer to [the administrator's] choice between competing medical opinions so long as it is rationally supported by record evidence." *Black*, 582 F.3d at 745. Applying this principle in *Holmstrom*, the Seventh Circuit explained that "MetLife would be entitled to disagree with [the treating physician's] opinion if there were evidence in the record providing a reasoned basis for doing so." 615 F.3d at 775. In *Holmstrom*, no such evidence existed, and the Seventh Circuit reversed MetLife's decision. *Id.*

In this case, by contrast, significant record evidence provided a reasoned basis for MetLife's decision to credit Dr. McPhee's interpretation of the EMG. Dr. McPhee's interpretation of the EMG was corroborated by the results of Hennen's 2012 MRI and her two 2014 MRIs. And Dr. McPhee's interpretation was supported by the fact that the EMG undisputedly "recorded no abnormal spontaneous or insertional activity in any of the muscles examined." DSMF ¶¶ 39, 56; PR ¶¶ 39, 56. Both Hennen's treating physician Dr. Kipka and Dr. McPhee agreed on this point. And Dr. McPhee opined that "abnormal spontaneous or insertional activity in any of the muscles examined . . . would be expected if there was active radiculopathy." DSMF ¶ 56; PR ¶ 56.

Dr. Kipka relied on different data from the EMG—increased motor unit potentials—to reach his "Impression" that the EMG gave "evidence to support left lumbar motor polyradiculopathies." PSMF ¶ 48; DSMF ¶¶ 38-40. Addressing the increased motor unit potentials data, Dr. McPhee explained:

> [T]he claimant had herniated discs in the past that presumably were compressing nerve roots causing radiculopathy . . . . [T]he discs were removed surgically and there is no longer compression on the nerve and no longer examination or EMG findings consistent with active radiculopathy . . . but the motor unit potentials observed may be evidence that she had radiculopathy in the past.

DSMF ¶ 59; PR ¶ 59. MetLife was entitled to rely on this explanation to discount Dr. Kipka's interpretation and to rely on Dr. McPhee's interpretation of the EMG.

Nor are Dr. McPhee's interpretations of the MRIs and EMG contrary to all clinical findings or findings of Hennen's treating physicians. Hennen's orthopedic surgeon, Dr. Phillips, opined that following her September 2012 surgery, Hennen's

"nerves were free of compression and mobile." DSMF ¶ 16; PR ¶ 15. Dr. Phillips then performed an MRI to "rule out any recurrent or residual neural compression," and determined that this MRI did not show neural compression. DSMF ¶¶ 20, 21; PR ¶¶ 20, 21.

Hennen tries to analogize Dr. McPhee's suggestion in his report addendum that "consideration should be given to an independent medical examination . . . if needed to further assess the issue of possible radiculopathy," R. 28-1 at 31, to a consulting physician in *Holmstrom* "retract[ing] his prior conclusion that disability had not been established," 615 F.3d at 775. Unlike the consulting physician *Holmstrom*, however, Dr. McPhee did not "retract" his prior opinion in his addendum. Rather, Dr. McPhee emphasized in his addendum his continuing medical opinion, including after review of Dr. Buvanendran's response letter, that Hennen's MRIs and EMG did not show current radiculopathy. DSMF ¶¶ 55, 56; PR ¶¶ 55, 56.

In light of the "deference" the Court must give "to Met Life's decision," it would be inappropriate for the Court to perform an "in-depth review of the record, identifying portions of medical reports that might support a diagnosis of radiculopathy." *Iley*, 261 F. App'x at 863; *accord Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 578 (7th Cir. 2006) ("reaching a decision amid . . . conflicting medical evidence is a question of judgment that should be left to [the administrator] under the arbitrary-and-capricious standard"). Rather, this Court "will only look to ensure that [the] decision has rational support in the record." *Becker*, 691 F.3d at 885

(quotation marks omitted). Based on Dr. McPhee's and Dr. Peters's analysis of the objective medical evidence, MetLife's decision had that support.

Hennen makes two additional arguments to support her claim for benefits. First, she claims that MetLife did not consider the possibility that she may have a condition called "chemical radiculitis." R. 26 at 9. But "radiculitis and radiculopathy are not identical diagnoses." *Marden*, 2012 WL 2020931, at *12 (MetLife properly distinguished between radiculitis and radiculopathy in denying coverage). In any event, because Hennen never asserted a "chemical radiculitis" theory during the administrative review and appeal proceedings, that theory is beyond the scope of this Court's review. *See Militello v. Cent. States, S.E. & S.W. Areas Pension Fund*, 360 F.3d 681, 686 (7th Cir. 2004) ("[B]ecause the standard of review is deferential, we consider only the evidence that was before the administrator when it made its decision.") (quotation marks omitted).

Second, Hennen argues that MetLife's conflict of interest weighs in favor of reversing its determination. She argues that MetLife's reliance on Dr. McPhee, a "notoriously biased file-reviewing physician," shows its conflict of interest. R. 26 at 13. In support, Hennen points to Dr. McPhee's supposedly "arbitrary insistence on evidence of 'active' radiculopathy." *Id.* As the Court has already found, however, this insistence was not arbitrary but a reasonable interpretation of the Plan's requirements. Hennen attempts to analogize this case to *Holmstrom*, where MetLife's conflict was demonstrated in part by its "moving the target"—*i.e.*, inviting additional evidence and then "repeatedly" finding "the new evidence . . . not

sufficient under new standards or expectations that had not been communicated" to Holmstrom. 615 F.3d at 775-78. Unlike in *Holmstrom*, MetLife's requirement that Hennen present objective evidence of current radiculopathy was consistently communicated to Hennen (*see* DSMF ¶¶ 18, 29, 30, 32, 42; PR ¶¶ 18, 29, 30, 32, 42), and was a reasonable interpretation of the Plan.

Hennen also points to the fact that MetLife pays Dr. McPhee and has done so many times in the past as evidence of bias. But the Seventh Circuit has rejected the argument that physicians like Dr. McPhee are "inherently biased" just because they are paid by an employer. *See Williams v. Aetna Life Ins. Co.*, 509 F.3d 317, 325 (7th Cir. 2007). Finally, Hennen points to several court decisions criticizing Dr. McPhee. R. 26 at 15. In response, however, MetLife points to many decisions crediting Dr. McPhee's medical opinions. R. 44 at 16.

Ultimately, as Hennen acknowledges, conflict of interest is merely a tiebreaker in borderline cases. R. 26 at 13. This is not such a case. Because MetLife's determination has clear, rational support in the record, it satisfies an arbitrary and capricious standard of review. *E.g.*, *Becker*, 691 F.3d at 885.

## III. MetLife's Request For Attorney's Fees And Costs Is Denied.

In addition to seeking summary judgment, MetLife asks this Court to award it attorney's fees and costs. R. 34 at 20. In a beneficiary's ERISA action, "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1).

The Seventh Circuit has explained that "although § 1132(g)(1) does not explicitly differentiate between plaintiffs and defendants, a court will seldom abuse its discretion by refusing to award attorneys' fees and costs to a defendant." *Marquardt v. N. Am. Car Corp.*, 652 F.2d 715, 721 (7th Cir. 1981). Because Hennen's complaint "'had a solid basis'" and there is no evidence that it was brought "merely to harass" MetLife, the Court denies MetLife's request for fees and costs. *See Nichol v. Pullman Standard, Inc.*, 889 F.2d 115, 122 (7th Cir. 1989) (quoting *Bittner v. Sadoff & Rudoy Indus.*, 728 F.2d 820, 830 (7th Cir. 1984)) (affirming denial of fees and costs to defendant in ERISA case).

## Conclusion

For the foregoing reasons, Hennen's motion for summary judgment (R. 25) is denied. MetLife's motion for summary judgment (R. 29) is granted, but its request for attorney's fees and costs is denied.

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: September 20, 2017