## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SUSAN HENNEN, | |
| Plaintiff, | No. 15 C 9452 |
| v. | Judge Thomas M. Durkin |
| METROPOLITAN LIFE INSURANCE COMPANY, | |
| Defendant. | |

### MEMORANDUM OPINION AND ORDER

As part of the benefits she received from her employer, Plaintiff Susan Hennen received long-term disability benefits from Defendant Metropolitan Life Insurance Company (the "Plan"). Hennen claims MetLife improperly terminated her benefits under the Plan in violation of the Employee Retirement Income Security Act ("ERISA"). The parties have filed cross motions for summary judgment. For the reasons explained below, MetLife's motion for summary judgment is granted, Hennen's motion for summary judgment is denied, and MetLife's motion for summary judgment on its claim for offset of overpaid benefits is denied.

### Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most

favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the parties have filed cross-motions for summary judgment, the Court applies this standard to each motion separately to determine whether there is a genuine dispute of material fact and whether judgment should be entered as a matter of law. *Marcatante v. City of Chicago*, 657 F.3d 433, 438-39 (7th Cir. 2011). In ruling on each cross-motion for summary judgment, the Court draws inferences in favor of the party against whom the motion under consideration is made. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011).

## Background

### I.    The Employee Benefit Plan

The Plan limits disability coverage for certain conditions to two years. From 2012 to 2014, Hennen qualified for disability coverage under the Plan. PSMF ¶ 13.[1]

Under the Plan, "'Disability' means that due to sickness, pregnancy, or accidental injury, you are receiving Appropriate Care and treatment from a Doctor

---

[1] References to Hennen's Local Rule 56.1 Statement of Material Facts, R. 99, are cited as "PSMF." References to MetLife's Local Rule 56.1 Statement of Material Facts, R. 104, are cited as "DSMF." References to Hennen's Response to MetLife's Statement of Material Facts, R. 107, are cited as "PR." References to MetLife's Response to Hennen's Statement of Material Facts, R. 110, are cited as "DR."

on a continuing basis." DSMF ¶ 3. In a Section titled "Limitation for Disabilities Due to Particular Conditions," the Plan explains that "Monthly Benefits are limited to 24 months during your lifetime if you are disabled due to a . . . Neuromusculoskeletal and soft tissue disorder . . . unless the Disability has objective evidence of . . . radiculopathies." *Id*. at ¶ 4.

The Plan defines "[n]neuromusculoskeletal and soft tissue disorder" as "any disease or disorder of the spine or extremities and their surrounding soft tissue; including sprains and strains of joints and adjacent muscles." *Id*. The Plan defines "radiculopathies" as "[d]isease of the peripheral nerve roots supported by objective clinical findings of nerve pathology." *Id*.

## II.    Hennen's Medical History Prior to September 2017

Hennen's history of low-back problems dates back to at least 2003, when she had her first low-back surgery. She had another in 2008. PSMF ¶ 11. Following a third surgery in September 2012 for a herniated disk, MetLife approved Hennen's claim for LTD benefits. *Id*. at ¶ 19. In its approval letter, MetLife informed Hennen that she satisfied the Plan's definition of "[n]euromusculoskeletal and soft tissue disorder" and that "the maximum benefit duration due to th[is] limited condition will be reached on November 11, 2014 . . . . Benefits may continue after November 11, 2014 if you continue to satisfy the definition of disability solely due to other non-limited medical condition(s) and other plan requirements[.]" DSMF ¶ 19.

Both before Hennen began receiving LTD benefits and in the years that followed, she was treated by various doctors, including Dr. Shana Margolis (a

specialist in physical medicine at the Rehabilitation Institute of Chicago), Dr. Frank Phillips (an orthopedic surgeon who performed Hennen's 2012 surgery), Dr. Asokumar Buvanendran (an anesthesiologist at Rush University Medical Center), and Dr. Shane Nho (an orthopedic surgeon who performed Hennen's May 2014 surgery). PSMF ¶¶ 17, 18. Hennen was diagnosed with lumbar radiculopathy in February 2013 and March 2014 by Dr. Buvanendran, and in March 2014 by Dr. Matthew Jaycox, a colleague of Dr. Buvanendran. *Id.* at ¶¶ 24, 24, 39. The other findings of her physicians are detailed at length in this Court's 2017 order and the Seventh Circuit's 2018 order. *Hennen v. MetLife Ins. Co.*, R. 46, 2017 WL 4164027 (N.D. Ill. Sept. 20, 2017); *Hennen v. MetLife Ins. Co.*, 904 F.3d 532 (7th Cir. 2018).

### III.    MetLife's Termination of Hennen's Benefits

MetLife contacted Hennen on August 15, August 18, and September 18, 2014 to explain that an MRI or electromyogram ("EMG") was required to determine if her condition fell within the radiculopathies exception to the Plan's 24-month benefit limitation of neuromusculoskeletal and soft tissue disorders. DSMF ¶¶ 30, 31, 33. On October 13, MetLife sent a letter explaining its intent to terminate Hennen's benefits on November 11. *Id.* at ¶ 34.

On October 17, 2014, Dr. Buvanendran sent MetLife a letter reaffirming his diagnosis of lumbar radiculopathy. He included a copy of a September 2014 MRI. MetLife consulted with its medical doctor, Dr. David Peters, who found Hennen's September 2014 MRI "does not reveal ongoing nerve root or spinal cord compression

that would support a current diagnosis of radiculopathy." DSMF ¶ 37. Hennen's LTD benefits terminated in November 2014.

Hennen appealed MetLife's disability determination through its administrative review process. She provided copies of a nerve conduction study and needle EMG performed June 8, 2015 (upon referral by Dr. Buvanendran) by Dr. Joseph Kipta, Clinical Neurophysiology Fellow at Rush. PSMF ¶ 39. Dr. Kipta's impression was that the 2015 EMG supported polyradiculopathies, but he commented that "[n]o abnormal spontaneous or insertional activity was noted in any of the muscles examined." PSMF ¶ 49. MetLife's medical director, Dr. Dupe Adewumni, reviewed Hennen's appeal and agreed that the June 2015 EMG supported a diagnosis of lumbar radiculopathy. MetLife then consulted with Dr. Neil McPhee to assess Hennen's functionality to determine whether her condition made her disabled under the Plan. DSMF ¶ 42. Dr. McPhee, although not asked to do so and without examining Hennen, determined Hennen did not have radiculopathy. *Id*. at ¶ 43. Based on Dr. McPhee's findings, MetLife notified Hennen by letter dated October 8, 2015, that it was upholding its determination that the two-year neuromusculoskeletal limit applied and that Hennen did not satisfy the exception for radiculopathy. *Id*. ¶ 56.

## IV.    Prior Decision in This Court and Reversal by the Seventh Circuit

Hennen first brought this suit on October 23, 2015, alleging MetLife violated ERISA by improperly terminating her LTD benefits. R. 1. This Court granted summary judgment for MetLife, reasoning that MetLife reasonably interpreted the

5

Plan to require proof of "active radiculopathy" in November 2014 and that Hennen failed to offer evidence of active radiculopathy. *Hennen,* 2017 WL 4164027. The Court also found MetLife reasonably decided to credit Dr. McPhee's opinion over the opinions of Hennen's doctors. Hennen appealed the decision to the Seventh Circuit and was successful.

The Seventh Circuit found Hennen had shown MetLife's termination of benefits was arbitrary and capricious, explaining:

> MetLife acted arbitrarily when it credited Dr. McPhee's opinion over the opinions of four other doctors, including Hennen's treating physician, two neurologists with clinical training in electrodiagnostic testing, and MetLife's own medical director. The arbitrary character is highlighted by MetLife's choice not to follow Dr. McPhee's ultimate recommendation, when his opinion was challenged, to order an independent medical evaluation and additional electrodiagnostic testing. For these reasons, we agree with Hennen that MetLife acted arbitrarily and that a remand to MetLife is necessary.

*Hennen,* 904 F.3d at 541. The Seventh Circuit found that MetLife took an extra step for its own benefit when it referred Hennen's file to Dr. McPhee for review but failed to take a step for Hennen's benefit when it ignored Dr. McPhee's recommendation that MetLife obtain additional testing to confirm whether his opinion was accurate. *Id*. In ERISA cases where the plan administrator did not "afford adequate procedures in its initial denial of benefits," the appropriate remedy is to remand the case to the administrator to correct the defective procedures and "provide the claimant with the procedures that she sought in the first place." *Hennen*, 904 F.3d at 542 (quoting *Hackett v. Xerox Corp. Long Term Disability Income Plan*, 315 F.3d 771, 776 (7th Cir. 2003)). Accordingly, the case was remanded to MetLife so it could reassess Hennen's claim. *Id*. at 542.

6

## V.     Post-Remand

On remand, Hennen provided new evidence to MetLife in support of her claim for benefits, and MetLife took additional steps in accordance with the Seventh Circuit's findings.

### A. Steps Taken by Hennen

In December 2018 and January 2019, Hennen submitted new evidence to MetLife in support of her appeal. She provided MetLife with a favorable Social Security decision from April 28, 2017, as well as her Social Security Disability Income ("SSDI") file which included a report from a March 11, 2015 examination documenting reduced lumbar range of motion and reduced strength in her left leg. PSMF ¶ 73. An administrative law judge for the Social Security Administration, whose notes were included in Hennen's SSDI file, gave many of Dr. Buvanendran's opinions "little weight," because he sometimes wrote vague notes or the "exact same detailed statement" on more than one date. DR ¶ 73. Hennen also provided medical records from Rush University Medical Center and Rush Pain Center from 2012-2018, including records from a December 2018 hospitalization with exam notes documenting tenderness of the lumbar spine, diminished sensation of the left leg, and diminished strength in both legs, culminating in a diagnosis of lumbar radiculopathy. PSMF ¶ 73. Additionally, Hennen submitted a questionnaire from Dr. Buvanendran indicating an ongoing disability due in part to radiculopathy. *Id.*

### B. Steps Taken by MetLife

MetLife began its evaluation on administrative remand on February 4, 2019. DSMF ¶ 82. From the outset, it did more than it did in its 2014 review by arranging for a Neurology Independent Medical Examination ("IME") to be performed by Dr. Nicholas Schlageter, a board-certified neurologist, on March 18, 2019. *Id*. After conducting a physical examination including multiple tests, Dr. Schlageter prepared a written report documenting his findings and concluding that Hennen was not suffering from radiculopathy. *Id*. at ¶¶ 85, 86; R. 102 at 10.

In addition to conducting a physical examination, Dr. Schlageter reviewed Hennen's medical file and concluded, among other things, that her 2015 EMG did not support a diagnosis of radiculopathy. DSMF ¶ 86. He based this opinion on his findings that objective measurements (which are required under the Plan) in the EMG were all "normal or none." *Id*. He expressed concern that Dr. Kipta reached a diagnosis of radiculopathy without conducting certain tests, and opined that without those tests, a diagnosis of radiculopathy "must be rejected."[2] *Id*.

On September 26, 2019, MetLife informed Hennen by letter that it was upholding its determination that Hennen was not entitled to benefits beyond November 11, 2014, under the terms of the Plan. In the letter, MetLife explains "the IME took into account all of the medical records on file, including all test results when making his opinion. The IME opined the medical evidence did not support the

---

[2] Dr. Schlageter conducted one of the tests he believed should have been done in 2015, and explained his reasoning for not conducting the other, discussed *infra* at 19.

condition of radiculopathy back in 2014, or currently." *Id*. at ¶ 114. It went on to say that MetLife considered the opinions of Hennen's treating physicians, as well as any information submitted in support of her appeal. *Id*.

## Analysis

As an initial matter, the parties agree the Plan is governed by ERISA. When a plan grants discretion to its administrator, as is the case here, courts review ERISA benefits under the arbitrary-and-capricious standard. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Dragus v. Reliance Standard Life Ins. Co.*, 882 F.3d 667, 672 (7th Cir. 2018). The standard is deferential but "not a rubber stamp" and a court "will not uphold a termination when there is an absence of reasoning in the record to support it." *Holmstrom v. Metropolitan Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (quoting *Hackett,* 315 F.3d at 774-75). An administrator's decision will be upheld so long as "(1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome; (2) the decision is based on a reasonable explanation of relevant plan documents; or (3) the administrator has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.*" Hennen,* 904 F.3d at 539 (internal citations omitted). In reviewing an administrator's determination, courts must remain "cognizant of the conflict of interest that exists when the administrator has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due." *Id*. (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)). The

conflict is "weighed as a '*factor* in determining whether there is an abuse of discretion.'" *Glenn*, 554 U.S. at 115 (quoting *Firestone*, 489 U.S. at 115).

## I. MetLife's Determination on Remand was not Arbitrary and Capricious

### A. MetLife Reasonably Interpreted the Plan

Ordinary principles of contract interpretation govern the interpretation of an ERISA plan. *U.S. Airways, Inc. v. McCutchen*, 569 U.S. 88, 102 (2013). Courts construe ERISA plans by "looking to the terms of the plan" as well as to "other manifestations of the parties' intent." *Id.* (internal citations omitted). When doing so, courts are mindful of the "'background of common-sense understandings and legal principles that the parties may not have bothered to incorporate expressly but that operate as default rules to govern in the absence of a clear expression of the parties' [contrary] intent.'" *Id.* (quoting *Wal–Mart Stores, Inc. Assoc. Health & Welfare Plan v. Wells*, 213 F.3d 398, 402 (7th Cir. 2000)).

Here, the Plan provides "'Disability' means . . . you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis." DSMF ¶ 3. The Plan explains "Monthly Benefits are limited to 24 months during your lifetime if you are Disabled due to a . . . neuromusculoskeletal and soft tissue disorder . . . unless the Disability has objective evidence of . . . radiculopathies." *Id.* at ¶ 4.

Hennen does not dispute that the Plan requires "objective evidence" of radiculopathies but argues that Dr. Schlageter based his opinions on a "warped" definition of "objective." R. 100 at 18. Hennen argues that, in the case of radiculopathy, "objective" evidence includes "clinical history; clinical exam findings

10

of reduced strength, reflexes, and sensation in the affected limb; electrodiagnostic studies; and MRI imaging studies." R. 100 at 9 (citing Timothy Dillingham, *How to Evaluate Patients with Suspected Radiculopathy*, AANEM Basics with the Experts, 11 (2013) at 568-69). But even in the context of this definition, it is clear that Dr. Schlageter considered Hennen's evidence and explained his basis for disagreeing with her doctors. For example, regarding the 2015 EMG, Dr. Schlageter explained at length why it did not present objective evidence of radiculopathy, in part because measurements Hennen concedes are objective were normal.[3] R. 102 at 7. Dr. Schlageter also explained another test from the 2015 EMG—evidence that Hennen again concedes is objective—is insufficient to diagnose radiculopathy without the existence of other related testing, which he then conducted, finding no evidence of radiculopathy.[4] *Id*. at 7, 10.

Based on the record, Hennen's argument that Dr. Schlageter misunderstands the meaning of "objective" is misplaced. Both parties refer to the same forms of testing as objective, but they disagree on whether the objective testing supports a diagnosis of radiculopathy. In this difference of opinions, MetLife is entitled to rely on Dr. Schlageter.[5]

---

[3] The objective measurements were her insertional activity, fibrillation potentials, and positive sharp waves, which both parties agree constitute objective findings. R. 107 at 7.

[4] Both parties agree that sensory nerve root findings are objective, but Dr. Schlageter contends Hennen's sensory nerve root results do not support a diagnosis of radiculopathy without additional paraspinal testing, which was not conducted in 2015. R. 102 at 7.

[5] Hennen also briefly argues that the Plan does not require a diagnosis of radiculopathy to be established *exclusively* by objective evidence. R. 100 at 7. MetLife

11

### B. MetLife's Application of the Plan to Hennen has Rational Support in the Record

An administrator's application of an ERISA plan's provisions should be overturned under the arbitrary and capricious standard only where there is an "absence of reasoning in the record to support" that application. *Holmstrom*, at 766 (internal citations omitted). *See also Becker*, 691 F.3d at 885 (under the arbitrary and capricious standard, courts "will only look to ensure that [the] decision has rational support in the record") (internal citations omitted). ERISA requires that "specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for 'full and fair review' by the administrator." *Hackett*, at 775 (citing *Halpin v. W.W. Grainger*, 962 F.2d 685, 688-89 (7th Cir. 1992)).

There is no denying that Hennen, for many years, has suffered significant back pain. But the question before the Court is whether MetLife rationally relied on Dr. Schlageter's opinion to determine that Hennen's pain is not due to radiculopathy. MetLife terminated Hennen's benefits based on its finding that "the IME opined the

---

does not argue Hennen was required to establish a diagnosis by solely objective evidence, and states more than once that it relied on all evidence turned over by Hennen, in addition to the IME. Additionally, when Hennen first brought this suit, the Court determined that MetLife reasonably interpreted the Plan to require evidence of active radiculopathy. The Seventh Circuit did not find this Court erred in doing so, and the Court will thus not disturb that finding. Caselaw supports a finding that MetLife reasonably construed the Plan to require proof of active, current, or ongoing radiculopathy. *See, e.g., Jones v. Astrue*, 623 F.3d 1155, 1158 (7th Cir. 2010) (surgeon said plaintiff had no "active radiculopathy"); *Iley v. MetLife Ins. Co.*, 261 Fed. Appx. 860, 864 (6th Cir. 2008) (MetLife was not unreasonable to require objective clinical findings of radiculopathy supported by evidence "at any time, including at the end of the twenty-four month period"); *Iliff v. MetLife Ins. Co.*, 2012 WL 709234, *5 (E.D. Mo. Mar. 5, 2012) (MetLife reasonably interpreted the Plan to require evidence of radiculopathies at the end of the twenty-four month period).

medical information on file and examination did not support objective clinical findings of nerve pathology and therefore Ms. Hennen did not qualify for the condition of radiculopathy". PSMF ¶ 113. In opposing MetLife's termination of her benefits, Hennen focuses on the Seventh Circuit's findings, arguing that Dr. Schlageter's exam failed to conform to the Seventh Circuit's instructions, and MetLife's reliance on Dr. Schlageter's report was therefore arbitrary and capricious. Her arguments can be grouped into two categories: (1) that Dr. Schlageter's IME was incomplete and inaccurate; and (2) that Dr. Schlageter's review of her records was cursory. But the record supports a finding that both Dr. Schlageter's IME, as well as his review of Hennen's medical file, provided Hennen a full and fair review. MetLife's reliance on him was not arbitrary and capricious.

### i. Dr. Schlageter Performed an IME and Found Hennen Did Not Present Objective Evidence of Radiculopathy.

The most important step taken by MetLife on remand, and the most significant improvement from its prior termination of benefits, was its ordering of an IME. Dr. Schlageter conducted numerous tests: nerve conduction studies on both legs, a needle EMG on Hennen's left leg, and H-reflex testing. R. 102 at 5-6. He explained, at length, why the results of his tests did not support a diagnosis of radiculopathy. *Id.* (finding Hennen's nerve conduction studies to be "normal"); DR ¶ 105 (explaining that Hennen's H-reflex test was normal because objective measurements fell within normal range); DSMF ¶¶ 87, 109 (basing his opinion on a reasonable degree of medical certainty).

Hennen retained Dr. Julian Freeman, an internist with experience in neurology and electromyography, to review Dr. Schlageter's findings.[6] R. 100 at 4. Hennen argues, citing Dr. Freeman's opinion, that Dr. Schlageter's failure to conduct a needle EMG on Hennen's right leg was unjustified and renders the examination insufficient to test for radiculopathy. R. 108 at 3-4. MetLife responds that Dr. Schlageter exercised his professional judgment in declining to test Hennen's right leg when she was tearful and in significant pain during the nerve conduction study of her left leg. Dr. Schlageter, upon determining the EMG of Hennen's left leg did not present any abnormalities associated with radiculopathy, thought it unnecessary to inflict pain by conducting a needle EMG test on the right leg. R. 109 at 8.

The parties, unsurprisingly, disagree as to whether Hennen's left leg EMG was in fact "normal" and thus obviating the need for an EMG on the right leg. Hennen first argues that MetLife should have rejected Dr. Schlageter's opinions outright because he did not follow MetLife's request to perform EMG testing on her right leg. R. 100 at 13. Hennen oversimplifies the context of MetLife's request. It is true that MetLife requested a needle EMG testing the same muscle groups tested in the June 2015 EMG, and provided the test "should include the corresponding muscle groups of

---

[6] At the outset, Hennen argues Dr. Schlageter is board-certified in neurology, not clinical neurophysiology, which is the sub-specialty of medicine devoted to electrodiagnostic testing. R. 108 at 16. According to Hennen, this is "suspect," and she stops just short of implying MetLife is misrepresenting Dr. Schlageter's qualifications. *Id*. at 16-17. But Dr. Schlageter has 20 years of experience conducting EMG/NCV testing, R. 102 at 5, and regardless, "an ERISA plan is not required to hire specialists for every claimed malady in cases in which the plan hired an independent expert to conduct a physical examination of the claimant." *Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 607 (7th Cir. 2007).

both legs." *Id*. Hennen, however, goes on to say that Dr. Schlageter's failure to conduct a needle EMG on both legs is the equivalent of MetLife's previous failure to order an IME at the suggestion of Dr. McPhee. *Id*. This is a false equivalence, because this time around MetLife requested an IME, and Dr. Schlageter conducted what appears to be a thorough examination and followed up on any remaining questions. MetLife also points out that it requested EMG testing on both legs "only because" the 2015 EMG showed "abnormal MUAP (muscle unit action potential) duration, amplitude, and polyphasic waved in all eight muscle groups" (meaning it may have presented evidence of radiculopathy). R. 109 at 8-9. Dr. McPhee's suggestion was to test the opposite leg "if [Dr. Kipta] thought motor unit potentials were of long duration in all left lower extremity muscles before coming to a conclusion of polyradiculopathies involving four nerve roots[.]" DSMF ¶ 43. On remand, upon testing Hennen's left leg, Dr. Schlageter found no electrodiagnostic evidence of radiculopathy in Hennen's left leg (as compared with Dr. Kipta's 2015 findings, to which Dr. McPhee was referring). R. 109 at 9. His decision not to conduct needle EMG testing on the right leg, therefore, was not the fatality to his examination's reliability that Hennen argues it to be, and MetLife was entitled to rely on it.

Dr. Freeman also opined that the needle EMG could have been made less painful by use of small gauge needles, and so potential pain was not a legitimate reason to skip the test. R. 100 at 13-14. MetLife points out that needle EMGs are far more painful than nerve conduction studies, and cites a medical article in support. R. 109 at 9 (citing Yalinay Dikmen, et al, *Expected & Experienced Pain Levels in*

*Electromyography*, Archives of Neuropsychiatry, 364-67 (2013)). Dr. Schlageter observed Hennen's pain during the nerve conduction study and determined a needle EMG would be too painful on her right leg. Nurse Ouding, RN, an "IME advocate" retained by Hennen to observe her examination, confirmed Hennen was crying during the nerve conduction study and "remain[ed] tearful" afterward. R. 109 at 8. MetLife was entitled to credit Dr. Schlageter's medical expertise in deciding not to conduct a needle EMG on Hennen's right leg, and his decision—for which he provided a rational explanation that has support in the record—does not render his examination insufficient. *Hennen*, 904 F.3d at 540; *Becker v. Chrysler LLC Health Care Benefits Plan*, 691 F.3d 879, 889 (7th Cir. 2012).

In his report, Dr. Schlageter also noted "reduced recruitment" in Hennen's left leg, but found the recruitment was secondary to pain (in other words, it was not objective evidence of radiculopathy). R. 109 at 10. In response to Dr. Freeman's opinion that the decreased recruitment must be classified as "abnormal," MetLife points the Court to a study in support of its position that Dr. Schlageter was in the best position to determine whether Hennen's reduced recruitment was secondary to pain. *Id*. (citing Kerry Mills, M.D., *Basics of Electromyography*, 76 J. Neurol. Neurosurg. Psychiatry 32, 32 (2005) ("A clinical judgment must be made by the electromyographer on the significance of reduced recruitment.")). Again, MetLife was entitled to credit Dr. Schlageter, an experienced electromyographer, in his opinion that the reduced recruitment was not evidence of radiculopathy.

16

Finally, Hennen argues the examination was incomplete because Dr. Schlageter did not perform straight leg testing.[7] R. 100 at 14. MetLife cites multiple studies referencing the shortcomings of straight leg testing, including their lack of usefulness in clarifying the cause of radicular pain and their "poor diagnostic performance." R. 109 at 15-16. Hennen does not point the Court to any medical authorities implying that the lack of straight leg testing renders the examination cursory. Dr. Schlageter reviewed Hennen's prior straight leg tests and found them to be consistently negative for left lumbar radiculopathy (in cases where Hennen's doctors interpreted them as positive) and pointed out the times her own doctors found negative results. DR ¶¶ 54, 73.

In totality, Dr. Schlageter's examination involved multiple tests, and he followed up on outstanding questions by Hennen, Hennen's counsel, and Dr. Freeman. The parties obviously disagree as to the findings. But in what is "essentially a contest of competing medical opinions," the deferential standard of review requires the Court to defer to the claim administrator's choice between opinions where it is supported by record evidence. *See Black v. Long Term Disability Ins.*, 582 F.3d 745 (7th Cir. 2009). Hennen has not shown that Dr. Schlageter's IME was incomplete, nor has she shown his interpretation of the results was incorrect. Rather, the opinions and findings resulting from the IME serve to address the Seventh Circuit's previous finding that MetLife was arbitrary and capricious for crediting a consulting physician

---

[7] Drs. Kipta and Malik did not perform straight leg testing, either, but Hennen does not argue that their examinations were less than thorough.

17

over Hennen's treating doctors with insufficient support to do so. Here, MetLife requested an examination (something it failed to do before), and the well-reasoned results provide ample support for its termination of benefits.

### ii. Dr. Schlageter Reviewed Hennen's Medical File and Did Not Find Support for a Diagnosis of Radiculopathy

Hennen next argues the Court should find MetLife's determination to be arbitrary and capricious because its review of her medical history leading up to her IME was not a full and fair one. The Court disagrees.

During his review, Dr. Schlageter opined the 2015 EMG did not provide objective evidence of radiculopathy. R. 102 at 6. He found the objective electrodiagnostic measurements were normal, and the "EMG test abnormalities only show muscle unit action potential (MUAP) abnormalities," which he found to be subjective, rather than objective, and thus not supportive of a radiculopathy diagnosis under the Plan. *Id*. Hennen argues Dr. Schlageter improperly dismissed the abnormal MUAPs as subjective, rendering his analysis of the 2015 EMG improper. R. 100 at 18-19. However, MetLife provides more than just Dr. Schlageter's language on subjectivity in its argument, pointing to a medical study explaining that "MUAPS are an "unacceptable sole diagnostic criteria" for lumbar radiculopathy, as they are "open to interpretation" and "best appreciated by skilled [electrodiagnostic] physicians." R. 102 at 13 (citing Karen Barr, M.D., *Electrodiagnosis of Lumbar Radiculopathy*, 24 Phys. Med. Rehabil. Clin. N. Am. 79, 83 (2013); Dillingham, at 11 ("More subjective findings (reduced recruitment) are open to interpretation and … care should be taken not to overcall radiculopathy.")). Hennen does not provide

medical studies to the contrary. MetLife's crediting of Dr. Schlageter's opinion on the MUAP disagreement is supported not only by Dr. Schlageter himself, but by medical studies which Hennen does not address.

Continuing his review of Hennen's medical file, Dr. Schlageter pointed out that Hennen should have received two additional tests as part of the 2015 EMG before a diagnosis of radiculopathy was given. R. 102 at 15. Without these tests, he explained, there remains at least one condition—lumbosacral plexopathy—which cannot be ruled out. [8] *Id*. On remand, Dr. Schlageter performed one of the tests he believed should have occurred during the 2015 EMG (H-reflex testing), and explained his reasoning for not conducting the other (paraspinal testing). DR ¶ 52.

During the remand, Hennen also provided MetLife with handwritten notes from Rush Pain Center from 2012-2014. PSMF ¶ 98. Hennen argues Dr. Schlageter, in his review of her file, improperly dismissed the records as illegible. R. 100 at 4. But it appears Dr. Schlageter did consider the records he could read and was never given transcriptions of numerous records he requested. MetLife requested "legible versions" of the Rush records from November 5, 2012, and January 17, March 15, April 29, May

---

[8] The symptoms of plexopathy include "extremity pain and motor or sensory deficits that do not correspond to an isolated nerve root or peripheral nerve distribution." R. 102 at 10 (citing Merck Manual, Professional Version, available at http://www.merckmanuals.com/professional/neurologic-disorders/peripheral-nervous-system-and-motor-unit-disorders/brachial-plexus-and-lumbosacral-plexus-disorders). Dr. Schlageter believes Hennen suffers from lumbosacral plexopathy, DR ¶ 87, which does not qualify for the radiculopathy exception to the Plan's 24-month limit. The Court is not ruling on the issue of whether Hennen has plexopathy, although the parties spend much time debating it. What is relevant here is whether MetLife had rational support in determining Hennen does not present objective evidence of radiculopathy.

17, August 19, December 13, and December 20, 2013. DR ¶ 98. On May 20, 2019, Hennen's counsel responded "[W]e respectfully decline…we will rest on the notes in their current state." DSMF ¶ 93. Hennen's counsel explained that she was able to read the notes and transcribed some of them in a July 12, 2019 letter. PR ¶ 93; DR ¶ 98. Specifically, Hennen's counsel provided excerpts from visit notes dated November 5, 2012, January 18, May 30, July 30, and August "30(?)" 2013, and July 11, 2014. DR ¶ 98. Her transcriptions of the November 5, 2012 or January 17, 2013 notes were incomplete, and she did not provide any transcriptions for the other dates requested by MetLife: March 15, April 29, May 17, August 19, December 13, or December 20, 2013. *Id.* Dr. Schlageter, at various points, refers to the Rush notes, and appears to have fully and fairly reviewed the ones he was given, while unsuccessfully attempting to obtain the ones he could not read.

Hennen then attacks Dr. Schlageter's review of her file by arguing he was selective in the years and examinations he considered. R. 100 at 16. But Hennen contradicts herself, first arguing that Dr. Schlageter improperly limited his review to records from "on or about 11/14/2014," and arguing in the following paragraph that his review was limited to medical records from 2018 and 2019 "to the exclusion of all other evidence." *Id.* at 16-17. Hennen argues Dr. Schlageter's limited review is analogous to what the Seventh Circuit condemned in *Holmstrom*. *Id.* at 16 (citing *Holmstrom*, 615 F.3d at 776). The *Holmstrom* Court, however, faulted MetLife for "moving the target" when it dismissed all evidence generated after the date of its initial termination of benefits. *Holmstrom*, at 776. Hennen argues the same is true

20

here, while recognizing on the next page that Dr. Schlageter considered records from 2018 and 2019, up to five years after the initial termination of her benefits. R. 100 at 19-20. Regardless, Dr. Schlageter states multiple times that he reviewed all records in Hennen's file, as does MetLife in its termination letter to Hennen. The example Hennen cites to illustrate Dr. Schlageter's alleged limited review is his August 23, 2019 addendum, in which he is directly answering MetLife's request for explanation as to his assessment of her current function restrictions from his IME report. He answers by explaining his assessment of Hennen's restrictions was based on the neurologic exam performed that day, as well as an MRI from December 26, 2018. R. 109 at 21-22; R. 100 at 17. He was not stating these dates were the only evidence he considered in determining whether Hennen had radiculopathy, or that he limited his entire review to those dates. He analyzes and explains his opinions on many of Hennen's prior tests, dating back to 2012. *See, e.g.*, DSMF ¶ 105 (analyzing an MRI from 12/28/2012).

Further, Hennen's argument that Dr. Schlageter limited his review to a certain time period (the exact time period she argues is unclear, as she implies he failed to consider 2015 results as untimely, then limited his review to 2018 and 2019) ignores the fact—discussed by both parties—that Dr. Schlageter spent extensive time analyzing Hennen's June 2015 EMG. There is no indication that MetLife improperly moved the target as found in *Holmstrom*, nor is there reason to believe Dr. Schlageter only considered certain time periods. He bases his findings on dates over the span of

seven years in his reports. Hennen has not established that Dr. Schlageter's review was improperly selective.

Dr. Schlageter's review of Hennen's medical file, in conjunction with his IME, provided Hennen a full and fair review of her claim for benefits. MetLife's determination that Hennen did not provide objective evidence of radiculopathy finds rational support in the record. Not only did Dr. Schlageter find that her 2015 EMG, as well as her 2012-2018 records from Rush and the remainder of her extensive medical file, showed no evidence of radiculopathy, but he then examined her himself and determined that such evidence was not present. Hennen has multiple doctors who came to the opposite conclusion. But Dr. Schlageter's opinion is supported by record evidence, and the Court must defer to MetLife's reliance on it. *Black v. Long Term Disability Ins.*, 582 F.3d at 745. In light of the deference the Court must give to MetLife's decision, it would be inappropriate to perform an "in-depth review of the record, identifying portions of the medical reports that might support a diagnosis of radiculopathy." *Iley*, 261 Fed. Appx. at 863. *See also Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 578 (7th Cir. 2006) ("reaching a decision amid … conflicting medical evidence is a question of judgment that should be left to [the administrator] under the arbitrary and capricious standard").

*     *     *     *

Considering all the evidence, the Court cannot say that MetLife's Finding MetLife's determination that Hennen does not have radiculopathy is unreasonable or lacks rational support. On remand, MetLife adequately addressed the weaknesses

22

previously identified by the Seventh Circuit.[9] Significant record evidence now provides a reasoned basis for MetLife's decision to credit Dr. Schlageter's interpretation of Hennen's medical records, as well as his interpretation of his own examination of her.

### C. Hennen has not Established that a Conflict of Interest Influenced MetLife's Decision

Plan administrators often have an inherent conflict of interest because the administrator both decides whether payment should be made and is responsible for making the payment. A conflict of interest is "more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision." *Glenn*, 554 U.S. at 117. Such circumstances include "cases where an insurance company administrator has a history of biased claims administration." *Id*. However, a conflict of interest may not be important at all "where the administrator has taken active steps to reduce potential bias and promote accuracy, for example, by walling off claims administrators from those interested in firm

---

[9] The Seventh Circuit also noted "concerns" which it did not hold were arbitrary and capricious but instructed MetLife to address on remand. *Hennen*, 904 F.3d at 541. First, the Seventh Circuit expressed concern that MetLife did not respond to Hennen's argument that it only considered radiculopathies caused by nerve compression, when that is only one potential cause of the condition. *Id*. MetLife addressed this by instructing Dr. Schlageter to "consider all potential causes of radiculopathy *and do not limit your assessment only to radiculopathy caused by compression of the nerve root*." R. 108 at 5 (emphasis added). Second, the Seventh Circuit, without ruling on the merits of the argument, instructed MetLife to address Hennen's contention that neither MRIs nor EMGs are conclusive for radiculopathy. *Hennen*, 904 F.3d at 541. On remand, MetLife cited to a medical study pointing to needle EMG testing as "the single most useful diagnostic tool in radiculopathy." R. 102 at 10 (citing Bryan Tsao, M.D., *Electrodiagnosis of Cervical & Lumbosacral Radiculopathy*, 25 Neurol. Clin. 473, 480 (2007)).

finances, or by imposing management checks that penalize inaccurate decision making irrespective of whom the inaccuracy benefits." *Id*.

Hennen asserts MetLife's conduct was motivated by its conflict of interest as being both the evaluator and payor of benefits. R. 108 at 19. In support, Hennen points to MetLife's denial letter, arguing MetLife "appears to suggest" that Dr. Schlageter's reports were favored because his 2019 exam and EMG were more recent than Hennen's other examinations and EMGs. *Id*. at 20. However, she then acknowledges that MetLife's letter also provided that Dr. Schlageter reviewed "all of the medical records on file, including all test results when making his opinion." *Id*. Hennen's contention is that Dr. Schlageter's explanations have no rational support, so MetLife's conflict of interest must weigh in favor of a finding of abuse of discretion. *Id*. The Court already found that MetLife's determination has support in the record, and therefore this is not a "borderline" case in which a conflict of interest will serve as a tiebreaker. *Glenn*, at 117. Because MetLife's determination has clear, rational support in the record, it survives an arbitrary and capricious standard of review. *See, e.g., Becker*, 691 F.3d at 885.

## II.    MetLife's Counterclaim to Offset Overpaid Plan Benefits

MetLife seeks summary judgment on its counterclaim for overpayment in the event the Court grants Hennen's motion for summary judgment. Because the Court is granting summary judgment in favor of MetLife, summary judgment on MetLife's claim for overpayment of benefits is denied.

MetLife also asks this Court to award it attorney's fees and costs. R. 102 at 20. In a beneficiary's ERISA action, "the court in its discretion may allow a reasonable attorney's fee and cost of action to either party." 29 U.S.C. § 1132(g)(1). The Seventh Circuit has explained that "although § 1132(g)(1) does not explicitly differentiate between plaintiffs and defendants, a court will seldom abuse its discretion by refusing to award attorneys' fees and costs to a defendant." *Marquardt v. N. Am. Car Corp.*, 652 F.2d 715, 721 (7th Cir. 1981). Hennen's complaint "had a solid basis" and there is no evidence that it was brought "merely to harass" MetLife, so the Court denies MetLife's request for fees and costs. *See Nichol v. Pullman Standard, Inc.*, 889 F.2d 115, 122 (7th Cir. 1989) (affirming denial of fees and costs to defendant in ERISA case).

## Conclusion

For the foregoing reasons, Hennen's motion for summary judgment, R. 100, is denied in its entirety. MetLife's motion for summary judgment, R. 102, is granted, and its motion for summary judgment on its counterclaim is denied. MetLife's request for attorney's fees is denied.

ENTERED:

_Thomas M Durkin_

Honorable Thomas M. Durkin
United States District Judge

Dated: December 6, 2021

25